# United States Court of Appeals
# for the Fifth Circuit

_____

No. 24-40779

_____

United States Court of Appeals
Fifth Circuit

**FILED**
July 7, 2026

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Matthew John Theiler; Susan L. Hertzberg; David Weldon Kraus; Thomas Gray Hardaway,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CR-3-1, 6:22-CR-3-2,
6:22-CR-3-3, 6:22-CR-3-5

_____

Before Higginbotham, Smith, and Oldham, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

A jury found Susan Hertzberg, Thomas "Gray" Hardaway, Matthew Theiler, and David Kraus guilty of conspiring to commit illegal remunerations under the Anti-Kickback Statute (AKS).[1] On appeal, the defendants challenge the sufficiency of the evidence supporting their

_____

[1] 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b).

convictions and the district court's handling of the jury notes and instructions. We AFFIRM.

## I

This case is about a conspiracy to pay doctors for patient referrals, generating a grave misappropriation of American taxpayer dollars. The participants include a laboratory testing company, hospitals, pass-through entities called Management Service Organizations (MSOs), and physicians.

## A

Boston Heart Diagnostics, Inc. (BHD) develops advanced blood lipid tests used to diagnose heart disease and contracts with physicians and hospitals to deliver tests at a fixed price. The appellants are former BHD employees. Hertzberg served as CEO, Theiler served as vice president of sales, and Kraus and Hardaway were sales representatives covering Texas.

Little River Health Care owned two "critical-access" hospitals in the rural outskirts of Austin, Texas. Critical-access hospitals provide health care to underserved communities and receive, by virtue of servicing this population, cost-based reimbursements from Medicare that significantly exceed standard fixed reimbursement rates.

In early 2015, Little River CEO Jeffrey Madison contacted Hardaway about a potential partnership. Separately, Dr. Jonathan Sheinberg, a BHD client who leased his practice to Little River, encouraged Hertzberg to do business with them. Little River and BHD entered a partnership agreement in March, whereby: (1) Little River would introduce BHD's tests to its network of affiliated physicians; (2) the physicians would refer their patients to Little River for BHD testing, and Little River would provide phlebotomy services for those physicians to reduce their overhead costs; (3) Little River would bill payors directly for the costs associated with BHD's tests under

No. 24-40779

Little River's favorable insurance contracts; and (4) BHD would run the tests submitted by the affiliated physicians. The partnership aimed to minimize overhead costs and maximize profits for both companies by capitalizing on Little River's high reimbursement rates as a critical-access hospital.

BHD soon learned the mechanics of Little River's operation. The hospital used pass-through entities called MSOs to recruit physicians to affiliate or "partner" with the hospital.[2] Affiliation involved referring procedures to Little River to capture the benefits of its lucrative insurance contracts. Generally speaking, MSOs operate lawfully when they provide marketing, advertising, IT, or administrative services in exchange for a fee from the physician.[3] Little River's MSOs could provide these professional services to "affiliated" physicians without issue. But as the AKS prohibits kickbacks for referring services paid by federal health programs, the MSOs could not legally compensate Little River's network of physicians for referring federally insured patients.

BHD's Texas sales team—namely Hardaway, Kraus, Jeff Parnell, and Laura Howard, all of whom reported to Theiler—managed BHD's relationship with Little River on the ground. They visited physicians' offices with an MSO "marketer" to onboard physicians to Little River's network. They would conduct follow-up visits a "couple times a week." The marketers included Robert O'Neal, Christopher Gonzales, and Ruben

---

[2] The scheme involved several MSOs, including Ascend, Rise, LGBR, Regal, BenefitPro, Exit Therapy, and Benchmark, among others. A co-conspirator testified that the MSOs were "just a piece of paper" and that "the names were secondary" because "[i]t was all for the purpose of procuring referrals."

[3] *See, e.g.*, *United States v. Sorensen*, 134 F.4th 493, 500–03 (7th Cir. 2025) (holding physician did not violate AKS by making payments to third-party MSO providing "only advertising services").

Marioni, among others. O'Neal was considered the "architect" and gatekeeper, as marketers had to "go through" him to work with certain hospitals.

The profitability of Little River's model was patent. BHD's annualized revenue from the partnership reached $4.4 million by June 2015, $12.9 million by July, and $20.8 million by September. The average reimbursement for each test billed under the agreement doubled by September, rising from around $400 to $942. And the Texas sales representatives' rates for blood-test orders increased by 51 percent, 257 percent, and 300 percent.

Some were understandably wary of the model, like JoAnna Shore, BHD's vice president of hospitals. In November, Shore told Hertzberg that she did not "fully understand the Little River business model," *i.e.*, its "marketing arm (MSO?)" and "targeted provider market." Shore stated her "strong recommendation and request, is that we reel this in and ask the field to stand down on any further client bill engagement with hospitals, Critical Access or otherwise, until we have an opportunity to train." In response, Hertzberg paused expansion of Texas hospital partnerships, arranged a call with Little River to learn more about its model, and hired Rob Rossi as vice president of compliance. Ultimately, Shore had persisting "questions" about the MSO model targeting physicians and advocated instead for a "joint venture" with Little River to "create a different approach."

Meanwhile, BHD "kept doing business with hospitals affiliated with MSOs," like Little River, and continued to see explosive revenue growth. From April 2015 to June 2016, BHD earned about $20.5 million in revenue from Little River, or $27 million with accounts receivable. Andy Flynn, a financial analyst, had projected annual revenues between $22 million and

$142 million for the Little River partnership based on the average volume for BHD's clients nationwide. Although within Flynn's projected range, the partnership's growth was eye-popping—Little River was a 30-bed rural hospital operating out of trailers, yet within months it had grown to comprise a quarter of BHD's projected nationwide annual revenue.

BHD pursued a broader share of the Texas market in the spring of 2016, as Little River and some high-volume physicians had begun doing business with True Health, a competitor lab. Theiler, his sales team, and marketer O'Neal negotiated new partnerships with Integrity Transitional Hospital in Denton and Stamford Hospital near Abilene.

Despite BHD's record-setting revenues and expansion opportunities, trouble brewed in paradise. Hertzberg resigned on May 31, 2016, as her relationship with the company's new owner (Eurofins) and board chairman (Jonathan Lapin) soured over personnel changes, compensation, and strategic direction. Three days later, Hertzberg and several other executives received a whistleblower complaint from hospital sales director Michael Ivers, detailing allegations of AKS violations within the company. Then came the exodus. Hertzberg publicly announced her resignation at the end of July and departed on August 9, 2016. Hardaway quit BHD that summer and continued working directly for the MSOs as a marketer. Theiler left in January 2017.

## B

A grand jury indicted 18 defendants for conspiracy to commit illegal remunerations in violation of 18 U.S.C. § 371 on January 12, 2022. Hertzberg, Hardaway, Theiler, Kraus, and Madison proceeded to a joint trial. The case was tried to a jury between October 16 and November 28, 2023. The government presented 23 witnesses, including co-conspirators Parnell, Howard, O'Neal, and Marioni, among others. The evidence showed the

conspirators used MSOs to recruit physicians to refer tests to hospitals and paid the physicians kickbacks based on referral volumes, then concealed the scheme through sham contracts and attestations.[4] Little River paid BHD employees to covertly work as MSO marketers. All defendants moved orally for acquittal after the government's case-in-chief and the close of evidence, and the court reserved its rulings.

At the charge conference, Hardaway requested an instruction that a defendant's good-faith belief in the lawfulness of his conduct is a complete defense to conspiracy.[5] The court refused, as the defendants could argue good faith based on the knowledge and willfulness instructions elsewhere in the charge.

The court submitted the case to the jury on November 28, 2023.[6] At 10:55 a.m. on November 29, the jury submitted a note that "Juror #12 is unwilling to change his mind based on the evidence provided and the instructions you provided" (note #3). Five minutes later, the jury added that

---

[4] Although Little River's contracts purported not to pay MSOs in connection with federally insured patients, Marioni testified that the hospital paid him for sending referrals that were "both commercial and federal" and that Madison and his in-house counsel knew these provisions were "false."

[5] The proposed instruction included the following, among other things: (1) good faith is a complete defense because it is "inconsistent with willfully providing improper remuneration"; (2) good faith includes "a belief or opinion honestly held or an absence of malice or ill will"; and (3) "[i]n determining whether a defendant acted in good faith, you may consider whether he or she had discussions with legal counsel or involved legal counsel in the relevant transactions . . . even if the defendant does not rely on any specific advice of counsel as discussed below."

[6] In total, the jury sent four notes to the court throughout its two-and-half days of deliberation. Soon after the jury retired, it sent a note identifying the foreperson (note #1). Later that afternoon, the jury submitted a note that juror #1 wanted to speak with Judge Kernodle (note #2), but the request was withdrawn soon after. Only the jury's third and fourth notes are at issue in this appeal.

"Juror #12 informed the jurors that his 'moral compass' would not allow him to be open minded. He also stated he would 'hang this jury'" (note #4). At 11:34 a.m., the court convened the parties, and it disclosed and read aloud only note #3. All agreed to the court's proposed response to note #3, delivered at 11:35 a.m., which read:

> I refer you to the instructions already provided. I further instruct you to continue deliberating in good faith until you reach a unanimous decision. You may be as leisurely in your deliberations as the occasion may require and should take all the time that you feel is necessary.

The jury returned a verdict the following morning. The court convened the parties and disclosed note #4, stating it was "very similar" to note #3 and that the court "did not directly respond to it."[7] No one objected or moved for mistrial. The court seated the jury and read the verdict—a unanimous finding that all five defendants were guilty of conspiring to violate the AKS. The court polled the jurors to ensure the verdict reflected their true intentions, and each affirmed so. The parties learned of note #4's content the next day.

The court denied the defendants' written motions for acquittal, or alternatively for a new trial. Hertzberg was sentenced to five years' probation, and Theiler, Kraus, and Hardaway were sentenced to prison for 18 months, 22 months, and 12 months and a day, respectively. All but Madison appealed.

---

[7] It is unclear from the record whether the court read note #4 before or after convening the parties on November 29. When the court disclosed note #4 to the parties on November 30, it stated, "we did receive a second note from the jury in the process of our responding to the first note."

No. 24-40779

The appellants raise overlapping claims before us. Hertzberg and Hardaway challenge the sufficiency of the evidence supporting (1) they knew of and joined the conspiracy, (2) the requisite federal nexus existed, and (3) they did not withdraw from the conspiracy. Theiler challenges only the sufficiency of the evidence supporting he knew of and joined the conspiracy. Hardaway and Kraus challenge the court's handling of the jury notes, arguing it (1) erred by not immediately disclosing note #4 and (2) instructed the jury with an erroneous *Allen* charge. Finally, Hardaway challenges the refusal of his good-faith instruction.

## II

The district court had subject-matter jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. We review challenges to the sufficiency of the evidence de novo,[8] forfeited challenges to the district court's handling of jury notes for plain error,[9] and refusals of jury instructions for abuse of discretion.[10]

## III

First, we assess Hertzberg's, Hardaway's, and Theiler's challenges to the sufficiency of the evidence. Then we discuss Kraus's and Hardaway's challenges to the district court's handling of the jury notes. And finally, we address Hardaway's challenge to the refusal of his good-faith instruction. For the reasons below, we find no error warranting reversal.

---

[8] *United States v. Marchetti*, 96 F.4th 818, 823 (5th Cir. 2024).

[9] *United States v. Thomas*, 724 F.3d 632, 641 (5th Cir. 2013). Section II.B explores the appropriate standard of review for the jury-note related claims further, as the parties dispute it.

[10] *United States v. Shah*, 95 F.4th 328, 376 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 518 (2025).

No. 24-40779

## A

Although we review sufficiency-of-the-evidence challenges de novo, we are "highly deferential" to the jury's guilty verdict and draw all reasonable inferences in the prosecution's favor.[11] We "must affirm a conviction if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,"[12] considering not "whether the jury correctly determined guilt or innocence, [only] whether the jury made a rational decision."[13] The verdict will be upheld so long as it is "not absurd, preposterous, foolish, or fanciful" based on the trial record.[14]

It is a crime to knowingly and willfully solicit, receive, offer, or pay a kickback "in return for referring an individual to a person for furnishing . . . any item or service for which payment may be made in whole or in part under a Federal health care program."[15] To act willfully means "with the specific intent to do something the law forbids or with bad purpose either to disobey or disregard the law."[16] To obtain a conspiracy conviction under the AKS, the government must prove beyond a reasonable doubt

---

[11] *Marchetti*, 96 F.4th at 823–24 (citation omitted). "By moving for judgments of acquittal following the government's case-in-chief and again at the close of evidence, the [defendants] have preserved the de novo standard of review as to their evidentiary sufficiency argument." *United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012).

[12] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[13] *United States v. Lopez–Urbina*, 434 F.3d 750, 757 (5th Cir. 2005) (alteration in original) (citation omitted).

[14] *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (citation omitted).

[15] 42 U.S.C. § 1320a-7b(b)(1), (2).

[16] *Shah*, 95 F.4th at 350 (cleaned up) (citation omitted); *see id.* (stating the criminal intent necessary to sustain a conspiracy conviction is the same as the underlying offense); 42 U.S.C. § 1320a-7b(b).

(1) "an agreement between two or more persons to pursue an unlawful objective," (2) "the defendant knew of the unlawful objective and voluntarily joined the conspiracy," and (3) the defendant committed "an overt act" in furtherance of the scheme.[17]

For the government to satisfy its burden of proof, "[d]irect evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence."[18] A defendant's "position of authority," "experience[] in the healthcare field," engagement in and concealment of "suspicious activities," "proximity to the fraudulent activities," and awareness of suspiciously "high profit margins" are all circumstantial evidence supporting knowledge of healthcare fraud.[19] Nevertheless, we do not "lightly infer[]" acquiescence in a conspiracy, as "'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.'"[20]

Finally, for jurisdictional purposes, the AKS requires that payment "may be made by" or "*could* be paid for by a federal healthcare program."[21] To satisfy this federal nexus, the government must show the defendants

---

[17] *Shah*, 95 F.4th at 350. No one challenges the sufficiency of the evidence as to the existence of an unlawful agreement and overt acts in furtherance of the scheme.

[18] *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (citation omitted); *see also United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ("[T]he jury may make factually based inferences."); *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (stating voluntary participation and knowledge may be inferred from a "collection" of "surrounding circumstances" (citation omitted)).

[19] *Willett*, 751 F.3d at 340–41; *Marchetti*, 96 F.4th at 828; *United States v. Tooker*, 957 F.2d 1209, 1216, 1218 (5th Cir. 1992), *as amended on denial of reh'g* (May 8, 1992).

[20] *Ganji*, 880 F.3d at 767 (citations omitted).

[21] *Shah*, 95 F.4th at 352 (emphasis in original) (citations omitted); *see also id.* ("[A] person need not have actual knowledge of [the AKS] or specific intent to commit a violation of this section" (quoting 42 U.S.C. § 1320a-7b(h))).

No. 24-40779

"knowingly agreed to accept remuneration" in connection with referrals for "patients that *could* be federally insured."[22] It need not prove the defendants knew the conspiring physicians actually referred federally insured patients.[23]

**1**

Hertzberg argues her conviction is untenable as it rests on attenuated inferences from her position as CEO. She seeks vacatur of her conviction and acquittal on remand. We affirm, as the evidence of Hertzberg's (1) position of authority, (2) experience in the healthcare field, (3) awareness of suspiciously high profits, (4) proximity to fraudulent activities, (5) engagement and concealment of suspicious activities, and (6) financial stake in the scheme would enable a rational jury to infer she knowingly and willfully joined the conspiracy beyond a reasonable doubt.

The jury heard testimony that Hertzberg is an experienced, "brilliant" healthcare CEO, having led several companies before her six-year stint at BHD.[24] The jury learned Hertzberg is familiar with the AKS and how lab-testing companies may violate it.[25] Indeed, in 2011, Hertzberg herself alerted DOJ to potential AKS violations by a competitor lab. She reported that (1) the competitor lab was using a "marketing" company to pay "processing" and "handling" fees to physicians to induce orders at an inflated cost of $1,200 to $1,400 per test, compared to BHD's $370 tests, (2) sales representatives received unusually high compensation, and (3) the

---

[22] *Id.* (emphasis in original).

[23] *See id.*

[24] *See Willett*, 751 F.3d at 340 (stating position of authority is evidence supporting knowledge of healthcare fraud); *Marchetti*, 96 F.4th at 828 (same, as to experience in healthcare field).

[25] *See Read*, 710 F.3d at 226 (finding evidence sufficient for conspiracy where defendants were aware of regulations governing reimbursement, among other things).

lab experienced "explosive growth" of a "couple hundred million dollars or more" over two years, which was "unheard of from what [Hertzberg] had seen in the industry."

So, Hertzberg knew the warning signs of illegal marketing operations in her field. A few months into the partnership, Little River and Hertzberg's subordinates told her that Little River's MSOs were legitimate marketing entities that recruited doctors into the hospital's network. By October 2015, she knew from Kraus that Little River worked with MSOs to "recruit providers for the Hospital network" and gave "leads" to BHD on physicians interested in "joining the MSO with access to their test offering," then Little River collected "favorable reimbursement" and paid BHD at higher rates than it could otherwise collect. She also learned that, in Kraus's view, BHD needed to "watch out for . . . MSO's who are overzealous, working with providers [whose] interests don't align with BHD." An experienced healthcare CEO—one who recently reported a competitor for improperly using marketing entities to induce and compensate physician referrals—should have been, at minimum, suspicious that Little River's MSOs were "recruit[ing]" physicians without providing tangible services in return.

As with the competitor lab, Hertzberg witnessed the partnership's tremendous growth. Hertzberg received financial reports showing Little River drove BHD's annualized revenues up a net of $4.4 million in June 2015, $12.9 million by the next month, and $20.8 million by September. And by January 2016, she knew that physicians had grown 18.6 percent, hospital revenue had grown twelve-fold, total revenue growth was up 51 percent from

the year prior, and Texas grew more than any region.[26] Hertzberg received these reports with excitement, not concern. For instance, she responded to the September 2015 financials with, "WOWIE!!!!! HOW DO WE GET SOME MORE OF THAT???!!!!!!!"

Hertzberg also knew the average reimbursement per test from Little River was unusually high—between $900 and $1,200, compared to the usual $370—much like the competitor lab she reported to DOJ. She understood that Little River helped BHD set referral-volume records. Meanwhile, BHD's competitors were suffering from industry-wide negative trends after the "demise" of a competitor lab. Hertzberg told her board of directors that BHD had bounced back substantially in 2015, coinciding with the Little River partnership, while other labs "did not recover."

Defending her own lack of concern, Hertzberg emphasizes Flynn's testimony that the revenues from Little River did not make him suspicious that kickbacks were afoot. But Flynn was a financial analyst, not a seasoned healthcare CEO who reported a competitor for similarly inexplicable profits and test costs. As BHD executive Theo McCormick put it, people "notice" when a rural hospital is outperforming every other client. Another executive, Shore, voiced her "confus[ion]" about how a rural hospital could generate such high revenues from patients "way outside" the critical-access geographic scope. As in *Willett*, the jury "could infer that [Hertzberg] knew about the [kickbacks] because [her] duties made [her] aware of the high profit margins that [BHD] was receiving on the [tests referred by physicians]."[27]

---

[26] *See Willett*, 751 F.3d at 340–42 (finding defendant's awareness of suspiciously high profit margins, along with position of authority, was evidence supporting knowledge of healthcare fraud).

[27] *Id.* at 341.

In addition to her financial knowledge, Hertzberg's knowledge of the MSOs' operations was sufficient for the jury to infer her awareness of "malfeasance."[28] Howard, a co-conspirator sales representative and marketer, testified that Hertzberg was "aware" that the "MSOs were helping [BHD's] sales reps in the field," and that the MSOs "drove" "the Boston relationship with [Little River]." Indeed, Hertzberg knew MSOs were the most common source of leads to Little River and that many referring physicians had specialties unrelated to BHD's cardiovascular focus, like neurologists and psychiatrists.[29] And she would recall Kraus's warning to "watch out for" providers "[o]rdering testing on inappropriate patients" due to "MSO's who are overzealous, working with providers [whose] interests don't align with BHD or Hospital." It was not "foolish" for the jury to infer that an innocent healthcare CEO would have asked questions when she learned psychiatrists and neurologists were ordering high volumes of advanced blood lipid tests in response to outreach from marketing entities.[30]

The jury also heard testimony about Hertzberg's enduring "proximity to the fraudulent activities."[31] Hertzberg played a key role in the genesis of the Little River-BHD partnership, and she had calls and in-person meetings

---

[28] *See United States v. Hesson*, 746 F. App'x 324, 334 (5th Cir. 2018) (unpublished) ("[W]hen an individual holds a position of authority within a company and remains within 'proximity to the fraudulent activities,' it is evidence that the defendant was aware of malfeasance within that company." (quoting *Willett*, 751 F.3d at 340)).

[29] *See United States v. Murthil*, 679 F. App'x 343, 349 (5th Cir. 2017) (unpublished) (finding evidence sufficient for conviction where government presented testimony that defendant, who had a leadership role in the company, "understood the healthcare regulations" and "knew her patients came from recruiters, not from doctor's referrals").

[30] *Sanders*, 952 F.3d at 273 (citation omitted).

[31] *Willett*, 751 F.3d at 340.

with co-defendant Madison and Dr. Sheinberg, among other Little River staff. She maintained a close, "loyal" working relationship with co-defendant Theiler and would join calls about Little River with the conspiring Texas sales team at least once a month. Howard testified "there was in-depth conversation about the MSOs and the influence that they provided" on these calls with Hertzberg.

And as time went on, Hertzberg's actions furthered the scheme's growth.[32] The jury heard that BHD's relationship with Little River "progressed largely due to the activities of the senior management team." Hertzberg encouraged her sales employees to continue to grow BHD's business with Little River, asking them "what [they] would need to kick 2015 samples through the roof." She followed through, helping recruit Dr. Robert Megna, a rural physician who referred a high volume of lipid tests and had recently received a Medicare call that "spooked" him on the MSO-billing model. Howard testified that Dr. Megna became an MSO member afterward.

Hertzberg also participated in BHD's replication of the Little River deal with other hospitals in Texas. In December 2015, she discussed BHD's accounts with Integrity Transitional Hospital via email with co-conspirators. Kraus explained Integrity was a lead from Benchmark, an MSO they all knew to be "misleading and dirty" (so much so that Little River cut ties with it).

---

[32] *See United States v. Martinez*, 921 F.3d 452, 467 (5th Cir. 2019) (considering defendants' actions that furthered the conspiracy to determine sufficiency of evidence for knowledge); *United States v. Mauskar,* 557 F.3d 219, 230 (5th Cir. 2009) (finding evidence sufficient for conspiracy where "the government would not have suffered the losses it did" without defendant's conduct); *Willett*, 751 F.3d at 342 (similar).

Hertzberg was also involved in the genesis of BHD's partnership with Stamford Hospital, approving the pricing for the agreement in May 2016.[33]

Most telling is Hertzberg's response to Ivers's whistleblower complaint. He raised the following allegations: (1) BHD's partnerships with Little River and Integrity were "a Compliancy Disaster"; (2) people associated with Little River and Integrity have "broken the law as it relates to critical access hospitals, physician referral, billing through [the hospitals] and much more with the association of the MSO's who are working on behalf of all parties"; (3) Little River and Integrity's "average patient requisition" was $1,200 per test, compared to BHD's $400 national average, and had "accounted for close to 30% of all of BHD's total gross yearly revenue"; (4) BHD's sales representatives were "tied" to these hospitals and "doing an extremely high volume of business"; (5) "those prescribing BHD testing . . . are in fact being incentivized through a model" in which they can partner or have an ownership stake; (6) Ivers had been told to ignore these hospitals and "never put anything in email regarding them"; and (7) the "VP of Sales" (Theiler) was "concealing customer data" concerning Little River, Integrity, and the Texas market.

Hertzberg emphasizes the complaint came on the heels of her resignation, as her power waned. But her looming departure from BHD did not impact her ability to report suspicious activities to the authorities; indeed, she knew whom to call at DOJ. Instead, Hertzberg approached Ivers—with the vice president of human resources by her side—and asked why he included so many people on his whistleblowing email. And the jury learned

---

[33] The Stamford deal "replicate[d]" the Little River partnership, involving the same pricing, marketers, and physicians. It differed in that Stamford billed commercial payors and BHD billed Medicare, whereas Little River billed both commercial and government payors.

that Ivers was soon transferred from the hospital division, where he had decades of experience, to a "cardiology business development" role. Ivers's new supervisor "had no knowledge of hospital business," and the two had an "extremely adversarial, challenging, confrontational" relationship. Based on the evidence before it, a rational jury could conclude Hertzberg "fail[ed] to take remedial action in response to an employee's concerns about company practices," indicating her complicity in the scheme.[34] As we found in *Marchetti*,

> [Hertzberg] was not just a low-level administrative employee caught up unknowingly in somebody else's conspiracy. There is sufficient evidence to infer that [Hertzberg] was put on notice that [Ivers] thought the scheme violated the AKS, was experienced in the healthcare field, and engaged in suspicious activities that allowed the jury to infer [she] was aware of unlawfulness.[35]

The jury also heard evidence suggesting concealment.[36] Hertzberg limited the distribution of Little River financial updates within the company, asking Flynn to "stop sending these updates to the distribution" and to "limit" circulation to herself and two others. Additionally, she interrupted Kraus's October 2015 presentation to the board on Little River. There, Kraus shared the explosive growth figures and explained how Little River used MSOs to recruit providers to its network. Hertzberg stood up and told the audience, "This isn't who we are, and this isn't clinically focused. This is not medically related." And Lapin, the board chairman, testified that he did not recall Hertzberg's telling him about "physician investors as referral

---

[34] *Hesson*, 746 F. App'x at 334 (citing *Willett*, 751 F.3d at 342).

[35] 96 F.4th at 828.

[36] *See Tooker*, 957 F.2d at 1216–18 (stating concealment suggests guilty knowledge).

sources to these rural hospitals" nor "involvement of MSOs in the hospital business."

Hertzberg's compliance efforts were also suspect. Lapin testified that BHD's "compliance committee" consisted of just Hertzberg, not a group external to senior management, which he found unusual. Rossi testified that although Hertzberg hired him as vice president of compliance, he felt "isolated" and "walled off," lacked the institutional knowledge to perform his role, and did not recall receiving questions from Hertzberg about MSOs or attending meetings with Little River. Lapin also testified that Hertzberg refused to grant access to the new general counsel after she vigorously opposed Lapin's decision to fire BHD's general counsel for withholding information from the board.

Finally, the jury heard evidence of Hertzberg's financial incentive to join and further the scheme.[37] Lapin testified that Hertzberg held a shareholder interest in BHD and stood to receive an "earnout" of up to $4.7 million from Eurofins after her departure. She was also eligible for performance bonuses.

Hertzberg also challenges the sufficiency of the jurisdictional federal nexus underlying her conspiracy conviction. We find the record sufficient to sustain a federal nexus. The government must show Hertzberg knew the referrals could have been for federally insured patients, not actual knowledge of such referrals.[38] Hertzberg knew that Little River's two rural hospitals were "paid a premium (3x standard rate) by government and private payors." Theiler informed her that Little River's "critical access" status

---

[37] *See Willett*, 751 F.3d at 340 (citing evidence that defendant benefited financially from the fraud in affirming conviction).

[38] *See Shah*, 95 F.4th at 352.

allowed it "to receive cost-based reimbursement from Medicare, instead of the standard fixed reimbursement rates." And Flynn's financial updates to Hertzberg regularly included figures from BHD's partnerships with other MSO-affiliated hospitals, noting "annualized revenue is based on both ITH Client bill reqs and ITH reqs in which BHD is billing Government Payors directly." Flynn's disclaimer informed Hertzberg that, at least as to Integrity (whose accounts were derived from MSOs, like Little River), BHD ran tests for patients insured by federal programs.

Hertzberg emphasizes the exculpatory evidence before the jury. Evidence sufficient for conviction need not, however, "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."[39] Isolated acts with "benign explanation[s]" may be incriminating by virtue of their "number and joint operation,"[40] and "the jury is free to choose among reasonable constructions of the evidence."[41] Viewing the evidence in the light most favorable to the jury's verdict, a rational juror could have found Hertzberg knew of and joined the conspiracy based on the circumstantial evidence before it.

**2**

Hardaway also challenges the sufficiency of the evidence supporting he knew of and joined the conspiracy. He argues he innocently believed that Little River paid the MSOs to advertise services, and physicians received a genuine return on investment. But the jury heard direct evidence from a co-conspirator implicating Hardaway, and we find the circumstantial evidence

---

[39] *United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir. 1994).

[40] *Vargas-Ocampo*, 747 F.3d at 303.

[41] *Bermea*, 30 F.3d at 1551; *see also Lopez–Urbina*, 434 F.3d at 757 (stating the court may not second-guess the jury's credibility determinations and weighing of the evidence).

concerning his (1) awareness of suspiciously high profits, (2) proximity to fraudulent activities, (3) engagement and concealment of suspicious activities, and (4) financial stake in the scheme would enable a rational jury to further infer he knowingly and willfully joined the conspiracy beyond a reasonable doubt.

Unlike Hertzberg, the prosecution offered direct evidence from a co-conspirator implicating Hardaway in the scheme.[42] Hardaway admits he knew Little River paid the MSOs and the MSOs paid physicians. And Marioni testified before the jury that Hardaway knew the MSO "made payments to physicians," knew "those payments were intended to induce referrals," and "seem[ed] to be familiar with those types of arrangements."

The jury also heard considerable circumstantial evidence that Hardaway understood the unlawful operations of the MSOs. In January 2016, Hardaway, Kraus, and Parnell prepared an executive summary for Hertzberg on the Little River partnership. The initial draft explained that marketers invite practitioners to invest in MSOs by purchasing shares, Little River remunerates the MSO, and the MSO disburses its profits among the practitioners who bought shares. Although the draft accurately described the model, Parnell removed mention of remunerating MSOs and paying doctors. Parnell testified his edits, which Hardaway received, were not an attempt to conceal the nature of the MSOs because "MSOs were so prevalent in the market that everyone seemed to have a grasp that physicians were investing, and it seemed like common knowledge to me."

---

[42] *Cf. United States v. Nora*, 988 F.3d 834, 832 (5th Cir. 2021) (stating although co-conspirators testified for the government, none testified the defendant "understood the unlawful or fraudulent purpose behind [the company's] practices").

The jury heard additional evidence of Hardaway's "proximity to the fraudulent activities," as he worked directly with co-conspirators to operate the scheme.[43] Hardaway was BHD's on-the-ground salesman who initially brought in Little River as a lead. He regularly teamed up with the co-conspirator marketers in the field to recruit and onboard physicians to Little River's network. And he participated in routine BHD sales calls discussing Little River, including a call in October 2015 where participants discussed the "influence" the MSOs provided.

The jury heard evidence of Hardaway's efforts to forward the scheme through hospital partnerships. Hardaway participated in BHD's expansion with Integrity, made possible by his and Parnell's dealings with Benchmark, a "dirty" MSO that Little River had "booted." To "solidify" the partnership, Hardaway joined Theiler for meetings with Integrity executives in January 2016. This effort continued in the following months, as BHD pursued a similar partnership with Stamford. Hardaway told Marioni that BHD was "trying to do business with Stamford," Stamford was "replicating" the Little River Model, and if Marioni wanted a "home," he should "move [his] MSO physicians" to Stamford.

Hardaway also worked to strengthen the scheme's marketing apparatus. The jury learned that Hardaway and Stan Jones were principals of an MSO called LGRB and partners in another MSO called Rise. While working for BHD, Hardaway secretly negotiated a marketing contract

---

[43] *Willett*, 751 F.3d at 340 (stating defendant's "proximity to the fraudulent activities" can lead to an inference of knowledge of fraud); *see also United States v. Thompson*, 761 F. App'x 283, 291 (5th Cir. 2019) (unpublished) (finding the defendant's "repeated exposure to the fraud" to be probative of his knowledge); *United States v. Brown*, 354 F. App'x 216, 221–22 (5th Cir. 2009) (unpublished) (finding defendant's "presen[ce] for many of the fraudulent transactions" was evidence sufficient for conspiracy conviction).

between Little River, LGRB, and Rise, and he worked with Madison to pitch other sales representatives to join the MSO model.[44] Howard testified that she "got the idea from Gray Hardaway" to start her secret side hustle, Ascend MSO. And after leaving BHD, Hardaway did business with BHD's competitor in his capacity at Rise. He competed with Marioni's MSO business, offering one of Marioni's "high volume" physicians a $10,000 "sign-on bonus" to join Rise.

Moreover, Hardaway knew of the high revenues and inflated test costs accompanying the Little River partnership.[45] He knew BHD collected over $940 per test, more than double the usual amount. He knew how many BHD tests were ordered through his MSOs—109 in June, 492 in July, and 283 in one week of October. BHD's financial report for September 2015 revealed Hardaway as the company's third-most productive sales representative with a 300 percent increase in requisitions.

Hardaway's financial benefits increased in proportion to these figures.[46] Sales representatives' commissions increased with revenues, and Hardaway got an additional "percentage of commissions" from Little River referrals because "he was involved in helping set [the partnership] up." Dr. Sheinberg testified that Hardaway was "beside himself" about this influx of cash. Hardaway also benefited financially through the partnership between Little River and Hardaway's MSOs. And people noticed—"[s]ome reps were asking questions about [Hardaway's] numbers" by October 2015.

---

[44] *See Tooker*, 957 F.2d at 1216–18 (stating concealment suggests guilty knowledge).

[45] *See Willett*, 751 F.3d at 341–42 (explaining factfinder may infer defendant's knowledge of illicit receipts where his duties made him aware of the commensurate high profit margins).

[46] *See id.* at 340 (citing evidence that defendant benefited financially from the fraud).

Finally, the jury heard evidence supporting a federal nexus as to Hardaway—that he conspired knowing the kickbacks could come from federally insured patients.[47] In April 2015, Hardaway emailed a BHD requisition form stating that "they [Little River] plan to use the c panel for commercial and m panel for Medicare." He texted with Madison about "[h]ow we properly coordinate blood samples and paperwork and copies of insurance for you guys to bill, etc[.]," and the jury heard that Madison regularly compensated MSOs for referrals that were "both commercial and federal." Around August 2015, Hardaway emailed Jones (his partner marketer) about anticipated revenue from Little River, stating he "estimated 60% of reqs [referrals for BHD tests] being commercial." Federal case agent Jack Geren testified this meant the other 40 percent of referrals were covered by federal programs like Medicare. Similarly, the executive summary Hardaway helped draft for Hertzberg noted that Little River's "Critical Access" status allowed it "to receive cost-based reimbursements from Medicare, instead of fixed reimbursement rates." The jury could reasonably infer that he would not have included this information if he believed Little River billed only commercial payors for BHD tests. And regarding Hardaway's MSO, Rise, Parnell suggested physicians "could just send whatever they wanted" and that "Rise-invested doctors actually did send federal samples to Little River."

In sum, the jury heard direct evidence from Marioni implicating Hardaway in the scheme and considerable circumstantial evidence demonstrating the same. A rational jury could have found Hardaway—a key player in the sales operations of BHD and several Little River-affiliated MSOs—guilty of conspiracy to violate the AKS.

---

[47] *See Shah*, 95 F.4th at 352.

No. 24-40779

**3**

Theiler also challenges the sufficiency of the evidence supporting he knew of and joined the conspiracy. He claims to have overseen all the conspirators without conspiring himself and conducted only legitimate activities in the ordinary course of business. We find the evidence concerning his (1) position of authority, (2) experience in the healthcare field, (3) awareness of suspiciously high profits, (4) proximity to fraudulent activities, (5) engagement and concealment of suspicious activities, and (6) financial stake in the scheme would enable a rational jury to infer he knowingly and willfully joined the conspiracy beyond a reasonable doubt.

Like Hertzberg, Theiler was "very smart" and experienced in the healthcare industry. He knew of the explosive growth from the Little River partnership, as he received the same financial updates as Hertzberg and knew his subordinates' sales figures were extraordinary. And contrary to his characterization of the conspiracy as "bottom-up," Theiler stated BHD's relationships with Little River and Integrity "progressed largely due to the activities of the senior management team" that spent "considerable time" working "to assure that accounts are sustainable."[48]

Several witnesses testified to Theiler's accurate understanding of Little River's illicit model, enabling the jury to infer his knowledge of the scheme.[49] Howard testified that Theiler was "aware" that "MSOs were helping [BHD's] sales reps in the field." At a sales conference in October

---

[48] *See Willett*, 751 F.3d at 341 (stating factfinder "could infer that [Theiler] knew about the [kickbacks] because he . . . had a position of authority in [BHD]" and "because his duties made him aware of the high profit margins that [BHD] was receiving on the [referrals]").

[49] *See United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) ("[K]nowledge may be inferred from surrounding circumstances." (citation omitted)).

2015, Parnell testified that he discussed MSOs with Theiler and that "everyone seemed to know the model and what was going on . . . that physicians had the opportunity to invest in" the MSOs, and he "[could not] imagine that [Theiler] would not know how [the MSOs] worked." That same month, Kraus told Theiler he "[found] out the MSO's working with Little River are not providing any management/administrative services for the office. The MSO's offer the access to testing . . . Heard their lawyer (Little River's) advised them to acquire practices in areas where they are ordering testing (Houston, Dallas) for compliance reasons/passing the sniff test." In other words, Kraus told Theiler that the MSOs were operating unlawfully by failing to provide tangible services and were covering it up. Soon after, Theiler also learned that MSOs were Little River's most common referral source and many of the referring physicians had "specialties that looked questionable, meaning they were not [BHD's] typical clients."

Even if Theiler missed the import of Kraus's words then, the scheme's illegality should have been apparent by February 2016. Theiler sent "questions about MSOs" to Rossi, the vice president of compliance, and he responded that MSOs must "service physicians" and cannot be a "sham" vehicle to pay physicians for referrals.[50] Knowing from Kraus that the MSOs were compensating physicians without providing any real services, an experienced executive like Theiler should have suspended, or at a minimum investigated, the partnership upon receiving this counsel from Rossi.

---

[50] *See Murthil*, 679 F. App'x at 349 (finding evidence sufficient for conviction where government presented testimony that defendant, who had a leadership role in the company, "understood the healthcare regulations" and "knew [the] patients came from recruiters, not from doctor's referrals").

The jury also heard evidence concerning Theiler's "proximity to the fraudulent activities."[51] Theiler had regular calls with his supervisees, including Hardaway and several co-conspirators who testified for the government. They discussed the MSO model at work in BHD's hospital partnerships and "the influence [it] provided." Crucially, Theiler also worked closely with O'Neal, the "architect" of the illicit MSO model.[52] In January 2016, Theiler met with O'Neal in Dallas "to discuss how Boston Heart can be involved in [O'Neal's] pursuit of hospital growth," along with co-conspirators Howard and Gonzales and a neurologist. In February, Theiler spoke with O'Neal about expanding the MSO model to "5 hospitals in six months" with "phlebs or processors in each of the offices to triage the work to the right facilities" and using a "fee schedule" from BHD. And in March, Theiler and Shore met with O'Neal in Beaumont. When Shore left the room, Theiler and O'Neal discussed "the terms of the Stamford and Boston Heart arrangement," with the possibility of "more hospitals being brought into the fold." Theiler "appreciated working with the relationship, and then also said that [BHD's] stock had gone sky high, and he needed a story line." Soon after, Theiler finalized an NDA with O'Neal and copied him on the email thread executing the partnership agreement with Stamford. From this evidence, the jury could infer that working with the "architect" of the conspiracy to expand its operations revealed Theiler's knowledge of and agreement to join and further the scheme.[53]

---

[51] *Willett*, 751 F.3d at 340.

[52] *See Nora*, 988 F.3d at 833 (stating defendant's close relationship with the "chief facilitator of the fraud" is evidence supporting a conspiracy conviction).

[53] *See Willett*, 751 F.3d at 340 (emphasizing defendant's "proximity to the fraudulent activities" can lead to inference of knowledge); *Brown*, 354 F. App'x at 221–22 (citing defendant's "presen[ce] for many of the fraudulent transactions" as evidence

No. 24-40779

The jury also heard evidence consistent with Theiler's concealment of the scheme.[54] Ivers directly implicated Theiler in his whistleblower complaint, alleging Theiler was "concealing customer data" concerning Little River, Integrity, and the Texas market. The prosecution corroborated Ivers's claim throughout trial. In October 2015, Theiler stated BHD staff were talking about Little River "way too openly, which is not good." At various points, Theiler told his team, "You guys don't send me emails about MSOs" and "just don't send me any emails about MSOs, please," which Parnell interpreted as Theiler not "want[ing] a paper trail."[55] When preparing his team for presentations on Little River, Theiler instructed them to "steer clear of pricing and profitability" and "stay away from reimbursement." The jury also learned that Theiler did not include Shore—the vice president of hospitals—in discussions with O'Neal and sales representatives about BHD's Texas hospital partnerships utilizing the MSO model.

Finally, the jury heard evidence of Theiler's financial stake in the scheme.[56] His "earnout potential" from Eurofins as a BHD shareholder was up to $750,000, and he was eligible for performance bonuses. A rational jury could have inferred from the above evidence that Theiler knew of and joined the conspiracy, so we affirm his conviction.

---

sufficient for conspiracy); *Thompson*, 761 F. App'x at 291 (finding the defendant's "repeated exposure to the fraud" to be probative of his knowledge).

[54] *See Tooker*, 957 F.2d at 1216–18 (stating concealment suggests guilty knowledge).

[55] *See id.* at 1218 (stating defendant "did not act openly but surreptitiously").

[56] *See Willett*, 751 F.3d at 340 (citing evidence that defendant benefited financially from the fraud in affirming conspiracy conviction).

No. 24-40779

**4**

We turn now to Hertzberg's and Hardaway's alternative argument that the jury irrationally concluded neither of them withdrew from the conspiracy. To prove the affirmative defense of withdrawal, a defendant must show by a preponderance of the evidence that he or she "acted affirmatively to defeat or disavow the purpose of the conspiracy" and communicated those acts in a "manner reasonably calculated to reach his or her conspirators."[57] "[M]ere cessation"[58] or "reduced . . . participation" is insufficient,[59] nor can a defendant show withdrawal if he or she continues to receive benefits from the conspiracy.[60]

Withdrawal must also be timely. "The statute of limitations for a conspiracy charge begins to run when the defendant withdraws,"[61] and such charges carry a five-year limitations period under the AKS.[62] So here, as the government indicted the defendants on January 12, 2022, Hertzberg and

---

[57] *United States v. Killian*, 639 F.2d 206, 209 (5th Cir. Unit A Mar. 1981).

[58] *United States v. Heard*, 709 F.3d 413, 428 (5th Cir. 2013).

[59] *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018); *see also Smith v. United States*, 568 U.S. 106, 114 (2023) (explaining defendant's responsibility for the conspiracy's acts "endures even if he is entirely *inactive* after joining it" (emphasis in original)).

[60] *See United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir. 1984) (stating conspiracy continues until defendant "ha[s] realized fully his anticipated economic benefits" and that this approach accords with the law of other circuits); *see also United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) (stating defendant "must not receive any additional benefits from the conspiracy" to show withdrawal).

[61] *Heard*, 709 F.3d at 427.

[62] 18 U.S.C. §§ 371, 3282(a).

Hardaway must show they withdrew from the conspiracy before January 12, 2017.[63]

Hertzberg contends a rational jury could not find she remained an active conspirator past January 12, 2017.[64] She cites two affirmative acts "defeat[ing] or disavow[ing]" the conspiracy: her separation from BHD in the summer of 2016 and her "refusal" to sign the Stamford partnership agreement in June 2016. Considering the trial record, a rational jury could find that neither act was sufficient to constitute withdrawal.

First, the evidence does not suggest Hertzberg's resignation was motivated by a desire to "defeat or disavow" the conspiracy.[65] She resigned because of tensions with Eurofins unrelated to the scheme. And when faced with Ivers's whistleblower complaint after her resignation, Hertzberg's conduct did not evince an intent to thwart the conspiracy.[66] The jury could expect a repentant CEO with one foot out the door to report suspicious conduct to the authorities (as she had before). Instead, Hertzberg chastised Ivers for sending his complaint to "so many people," and he soon found himself working in a different department.

Second, the jury heard evidence disputing Hertzberg's claim that she "refused" to sign the Stamford partnership agreement. There is no evidence that the agreement was sent to her for approval, and even if it had been, her

---

[63] *See Heard*, 709 F.3d at 427–28.

[64] *Killian*, 639 F.2d at 209.

[65] *Id.*

[66] *See Hesson*, 746 F. App'x at 334 (finding defendant's "fail[ure] to take remedial action in response to an employee's concerns about company practices" indicative of involvement in scheme).

independent signatory authority was already stripped.[67] Refusal presupposes a choice exists, yet Hertzberg could not have signed the agreement even if she wanted to. Moreover, her argument is hard to square with her approval of Stamford's pricing scheme shortly before her resignation.

Additionally, there was sufficient evidence for the jury to conclude Hertzberg continued to have a financial stake in the scheme after her departure and within the statute of limitations. Hertzberg did not release her earnout interest until she signed her settlement agreement on November 8, 2019, well within the limitations period.

Hardaway also contends that even if the evidence was sufficient for his conviction, there was sufficient evidence of his withdrawal. He claims to have "publicly resigned from Boston Heart in July 2016, thereby disassociating himself entirely from the conspiracy, and from that time forward had nothing to do with the alleged unlawful conduct." This argument fails to persuade. Hardaway may have left BHD in 2016, but the jury heard evidence of his continued involvement in the conspiracy through his MSOs. Moreover, the jury heard evidence suggesting Hardaway's "disavowal" by resignation was not reasonably calculated to reach his co-conspirators at BHD.[68] He gave no notice to Hertzberg or Theiler; they heard only through the grapevine that Hardaway's "numbers were going down and looked like he was leaving to go somewhere else for employment." A rational jury could find by a preponderance that Hardaway did not timely withdraw.

---

[67] Stamford sent BHD a partially executed contract the day after Hertzberg resigned. Kim Bracuti (BHD's CFO) signed it on June 1, 2016, as she had for the Little River deal. Hertzberg's successor, Tom Burnell, re-signed the Stamford contract on August 11, 2016 (Bracuti apparently was not the proper signatory).

[68] *Killian*, 639 F.2d at 209.

No. 24-40779

In conclusion, we affirm the challenged convictions as there was sufficient evidence from which a rational jury could find Hertzberg, Hardaway, and Theiler guilty of conspiring to violate the AKS.

**B**

Kraus and Hardaway challenge the district court's disclosure of jury note #4 and response to note #3, seeking a new trial. As a threshold issue, the parties dispute the standard of review. The government urges review for plain error because Kraus and Hardaway failed to object below.[69] Kraus and Hardaway contend that de novo review governs their disclosure claim and abuse of discretion governs their response claim,[70] as "Note 4 was not disclosed in a way that gave the parties an opportunity to object" and impacted their ability to adequately assess the court's response to note #3. For the reasons that follow, we find Kraus's and Hardaway's claims fail regardless of whether we review for plain error or under the less deferential standards urged.[71]

**1**

Kraus and Hardaway challenge the district court's failure to disclose note #4 immediately upon receipt. "Federal Rule of Criminal Procedure 43

---

[69] FED. R. CRIM. P. 51(b); *United States v. McClatchy*, 249 F.3d 348, 359 (5th Cir. 2001) (stating the court reviews for plain error when the defendant fails to object to the district court's supplemental instruction).

[70] *United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir. 1976) (reviewing unpreserved jury-note challenges for harmless error); *United States v. Jordan*, 851 F.3d 393, 398 (5th Cir. 2017) (preserved challenges to the district court's responses to jury notes are reviewed "for abuse of discretion, subject to harmless error analysis").

[71] *See United States v. Miles*, 360 F.3d 472, 483 (5th Cir. 2004) (leaving open the question of whether the defendant's challenge to the court's handling of jury notes and *Allen* charge was reviewed for abuse of discretion or plain error, reasoning that the defendant's claims failed under either standard).

guarantees a defendant the right to be present at every stage of the trial. That right requires that '[w]hen a communication is received from the jury, counsel should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given.'"[72]

Even under de novo review, the district court did not err by disclosing note #4 the morning after its submission. Our review of unpreserved jury-note challenges for harmless error has typically involved the district court's undisclosed responses to the jury, not undisclosed notes from the jury.[73] We have acknowledged that "[g]ranting counsel the opportunity to object only *after* the supplemental instruction has been delivered is too little, too late."[74] But our precedent does not prescribe a right to be immediately notified of every jury note, especially when the court determines in its sound discretion that the note does not warrant a response. Instead, defendants have a right to be heard "*before a supplemental charge is given.*"[75] Here, the court did not respond to note #4, so no supplemental charge was given.[76] And the court told the parties about note #4 the next time they assembled in the courtroom.

---

[72] *United States v. Bieganowski*, 313 F.3d 264, 293 (5th Cir. 2002) (citation omitted).

[73] *See, e.g.*, *United States v. Sylvester*, 143 F.3d 923, 928–29 (5th Cir. 1980); *Bieganowski*, 313 F.3d at 293; *McDuffie*, 542 F.2d at 241.

[74] *Sylvester*, 143 F.3d at 928 (emphasis in original).

[75] *Bieganowski*, 313 F.3d at 293 (emphasis added) (quoting *McDuffie*, 542 F.2d at 241)); *cf. Rogers v. United States*, 422 U.S. 35, 38 (1975) (stating "trial judge in a civil case had 'erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction'" (citation omitted)).

[76] *Cf. Bieganowski*, 313 F.3d at 293 (defendant's right to be present at trial was violated when district court gave supplemental instruction without informing the parties first); *Sylvester*, 143 F.3d at 928 (same).

No. 24-40779

Moreover, any error in failing to immediately disclose note #4 was harmless. Kraus and Hardaway contend they would have moved for mistrial or requested an *Allen* charge if note #4's contents were revealed before the jury reached a verdict. The district court correctly dismissed this argument, citing the "remarkabl[e] similar[ity]" and temporal proximity between the third and fourth notes and the parties' failure to raise any objection. And the court made clear that it would have denied a motion for mistrial and declined to give an *Allen* charge so early in the deliberative process.

**2**

Kraus and Hardaway further challenge the court's responses to the jury notes. They contend the jury would have understood the court's response to note #3 as a response to both the third and fourth notes given their back-to-back submissions. As note #4 referenced the juror's "moral compass" leading him to "hang the jury," Hardaway and Kraus argue the court should have responded again with a full *Allen* charge and its failure to do so rendered its prior response an erroneous *Allen* charge.

"[D]istrict courts enjoy 'wide latitude in deciding how to respond to questions from the jury,'"[77] including whether "to use a written charge" or "reply to a jury's request for additional instructions."[78] If the jury struggles to reach a verdict and notifies the court, the judge may respond with a special supplemental instruction—an *Allen* charge—which typically (1) reminds the jury of its duty to deliberate and the government's burden of proof, (2) urges

---

[77] *United States v. Hale*, 685 F.3d 522, 544 (5th Cir. 2012) (citation omitted); *see also Sylvester*, 143 F.3d at 927, 929 (treating responses to jury questions as supplemental instructions considered part of the charge).

[78] *United States v. Acosta*, 763 F.2d 671, 677 (5th Cir. 1985); *see also United States v. Hitt*, 473 F.3d 146, 153 (5th Cir. 2006) ("District courts have broad discretion to give *Allen* charges when the jury indicates deadlock.").

the jury to "forego their differences and come to a unanimous decision" without surrendering their honest convictions, (3) mentions that the case will remain open and possibly retried if the jury fails to reach a verdict, and (4) tells them to take all the time they feel is necessary.[79] If an *Allen* charge is given, we review its "compliance with two requirements: (1) the semantic deviation from approved *Allen* charges cannot be so prejudicial as to require reversal, and (2) the circumstances surrounding the giving of an approved *Allen* charge must not be coercive."[80]

Even if we review for abuse of discretion, Kraus's and Hardaway's claims fail. Before scrutinizing the instruction under *Allen* and its progeny, we first ask whether the district court's response to note #3 may fairly be described as an *Allen* charge. *Sylvester* is instructive.[81] There, after deliberating for a few hours, the jury sent a note stating, "We cannot agree— Some members will never vote guilty because there is no physical evidence and the word cocaine was never used in the conversations."[82] The court convened the jury and the parties, re-read portions of the charge concerning the offense elements and key definitions, and gave a supplemental instruction explaining the burden of proof as to each count and the weight of circumstantial evidence.[83] We found that the supplemental instruction was not an *Allen* charge simply because the jury's note opened with "[w]e cannot agree," although that phrase may in some circumstances indicate deadlock

---

[79] 5TH CIR. PATTERN JURY INSTR. CRIM. No. 1.54 (2024); *United States v. Eghobor*, 812 F.3d 352, 357 n.2 (5th Cir. 2015) (citation omitted).

[80] *United States v. Heath*, 970 F.2d 1397, 1406 (5th Cir. 1992) (internal quotation marks and citation omitted).

[81] *See* 143 F.3d at 927–28.

[82] *Id.* at 926–27.

[83] *Id.* at 927.

warranting an *Allen* charge.[84] Instead, "the instruction focused on the legal issues . . . rather than on the possible deadlock."[85]

Here, the district court responded to the jury's note that juror #12 was "unwilling to change his mind based on the evidence provided and the instructions you provided" with the following:

> I refer you to the instructions already provided. I further instruct you to continue deliberating in good faith until you reach a unanimous decision. You may be as leisurely in your deliberations as the occasion may require and should take all the time that you feel is necessary.

As in *Sylvester*, "[w]hile we agree with the appellants that the supplemental instruction was deficient as an *Allen* charge, we do not agree that it *was* an *Allen* charge."[86] *Sylvester* shows that magic words do not transform supplemental instructions into dynamite charges; indeed, "*Allen* charges are creatures of nuance."[87] Here, the district court tracked *Sylvester*, responding to early signs of deadlock by directing the jury to the instructions already given. Note #4's mention of juror #12's "moral compass" and intent to "hang this jury" did not transform the court's prior instruction into an *Allen* charge.

Moreover, the district court did not err by declining to respond to note #4 with a full *Allen* charge. The district court found notes #3 and #4 very similar, as note #4 lacked new questions or signs of deadlock.[88] The court

---

[84] *Id.* at 927–28.

[85] *Id.* at 928.

[86] *Id.* at 927–28 (emphasis in original).

[87] *Id.* at 927.

[88] Note #3 stated juror #12 was "unwilling to change his mind based on the evidence provided and the instructions you provided." Note #4 stated juror #12's "'moral

made clear that any response it might have given to note #4 would simply have repeated the response to note #3, then reasonably concluded that "separately responding to the fourth note could potentially confuse and disrupt the jury."[89] "[T]here is no error in the district court's refusal to submit a written charge, unless in the totality of the circumstances of the case the written response to the jury's inquiries created an unbalanced charge prejudicial to the defendants," and Kraus and Hardaway have made no such showing.[90]

Even if the failure to give a full *Allen* charge was error, it was harmless. Kraus and Hardaway insist the court needed to remind the jury not to sacrifice their conscientious beliefs for the sake of rendering a verdict. But that instruction was in the charge already: "Each of you must decide the case for yourself . . . do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." And the court pointed the jury back to these original instructions in response to note #3. Assuming arguendo the jurors understood the court's singular response to cover notes #3 and #4 and then reread the instructions, they would have been reminded of their duty to not give up their conscientious beliefs. We conclude that the district court did not err in its handling of the jury notes.

---

compass' would not allow him to be open minded" and that "he would 'hang this jury.'" In our view, note #4 simply fleshed out note #3—note #4 explains why juror #12 was "unwilling to change his mind."

[89] *See United States v. Bayer*, 331 U.S. 532, 536 (1947) ("The trial judge[,] in the light of the whole trial and with the jury before him[,] may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse.").

[90] *Acosta*, 763 F.2d at 677.

No. 24-40779

## C

Finally, we address the district court's refusal of Hardaway's requested good-faith instruction. To prevail, he must show the proposed instruction is "substantively correct," "not substantially covered" in the charge, and concerns an "important point" such that its omission "seriously impairs the defendant's ability to effectively present a particular defense."[91]

We review "under an 'exceedingly deferential' abuse of discretion standard."[92] "[T]he omission of a good faith jury instruction is not an abuse of discretion if the defendant is able to present his good faith defense to the jury through, *inter alia*, witnesses, closing arguments, and the other jury instructions."[93] And "[k]ey among these other jury instructions are those related to 'knowing' and 'willful' conduct because good-faith reliance defenses depend on disproving knowing or willful elements of the crime."[94]

Hardaway's argument "fails because the jury instructions the court gave covered the good-faith instruction it denied."[95] The district court instructed jurors that the government must prove Hardaway "knew the unlawful purpose" of the kickback conspiracy and "willfully" joined in it. The charge defined "knowingly" to mean "that the act was done voluntarily and intentionally, not because of mistake or accident," and it defined "willfully" to mean "that the act was committed voluntarily and purposely with the specific intent to do something the law forbids, that is to say, with the bad purpose to either disobey or disregard the law." We have affirmed

---

[91] *Shah*, 95 F.4th at 376–77 (citation omitted).

[92] *Id.* at 376 (citation omitted).

[93] *Id.* at 377.

[94] *Id.* (citation omitted).

[95] *Id.* (citation omitted).

the denial of a good-faith instruction where the charge includes this language.[96] "The instructions defining specific intent, 'knowingly,' and 'willingly' make plain that the jury was required to acquit [Hardaway] if, because of his good faith, he lacked specific intent."[97] Indeed, he made that argument to the jury in closing.

Hardaway argues *Shah* and similar cases are distinguishable because the district court instructed the jury regarding a defendant's "good faith reliance on the advice of counsel," creating "an erroneous belief that good faith is a defense only if all the elements for an advice-of-counsel defense are met."[98] Hardaway cites several district court cases where the court included separate good-faith and advice-of-counsel instructions in conspiracy jury charges.

That some judges have chosen to include general good-faith instructions in similar cases does not mean the district court abused its discretion by not doing so here. As the district court noted, the omission of a general good-faith instruction did not prevent Hardaway from arguing he "lacked scienter" because he believed "that a lawyer had looked at this and never raised a red flag." Indeed, the court stated, "I'm not going to limit them from referencing evidence that includes the involvement of

---

[96] *See, e.g.*, *id.*; *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Frame*, 236 F. App'x 15, 18 (5th Cir. 2007) (unpublished).

[97] *Frame*, 236 F. App'x at 18.

[98] Hardaway did not raise a "good faith reliance on advice of counsel" defense per se. Instead, he argued to the jury that because his MSO was "vetted by lawyers," he believed in good faith that all the MSOs were operating in compliance with the law. His proposed instruction would have prompted the jury to "consider whether [Hardaway] had discussions with legal counsel or involved legal counsel in the relevant transactions . . . even if the defendant does not rely on any specific advice of counsel as discussed below [in advice-of-counsel defense instructions]."

lawyers . . . it's incumbent upon the Government to cite the instructions on advice of counsel and point out that this Defendant is not relying on the advice-of-counsel defense, and they can't satisfy it," to which the government agreed. Applying the "'exceedingly deferential' abuse of discretion standard," the court did not err here by denying Hardaway's proffered instruction.

## IV

We AFFIRM Hertzberg's, Hardaway's, Theiler's, and Kraus's convictions, as we conclude (1) a rational jury could find that Hertzberg, Hardaway, and Theiler knowingly and willfully joined a conspiracy to commit illegal remunerations; (2) a rational jury could find sufficient evidence of a federal nexus as to Hertzberg and Hardaway; (3) a rational jury could find by a preponderance of the evidence that Hertzberg and Hardaway did not withdraw from the conspiracy; (4) the district court did not err—plainly or otherwise—in disclosing and responding to the jury notes; and (5) the district court did not abuse its discretion by refusing Hardaway's good-faith instruction.